Next cases are numbers 24-2097 and 24-2148 United States of America against Paul Girard, United States of America against Kareem Harry. Mr. DeRuzo. And good morning, your honors. Joseph DeRuzo on behalf of Paul Girard. I'd like to reserve five minutes for rebuttal. Great. Your honors, the underlying case was a vast, about a vast VCAR conspiracy. But for today, and the sole issue raised in my brief was the issue of the public trials laws. Out of the gate like to address the government's contention that this issue wasn't properly preserved. But to the government's credit, and the citations starting at page 43 of the government's brief, and continuing on through page 45 of the government's brief, indicate where the contemporaneous objections and the issues were raised the trial court. There was a post trial. No, they were during trial. They were during trial and post trial. Can you give us the record citations? Page 43 of the government's brief cites to the appendix from Harry at page 293. Wait, Harry's appendix doesn't have to be right. Oh, wait, wait, Jay, the JA citation 293. Okay. I've got that page up. What on it? Quoting here, quote, at least the defendant's family be able to sit in the courtroom. That not see. I see you testified about visitors in the courtroom. Were there times what came to the courthouse to view the trial? I don't recall. Do you recall denying access? I see nothing in here. He's looking at the Harry appendix. No, I'm looking at Gerard. So just to be clear, Judge Rivas, I'm referring to page 43 of the government's brief, which in cites to that the Harry appendix. Well, the Harry appendix citation does not support that. Okay. The government's brief, you're saying page 43, 43. Okay. So they cite and I can read you the members of the jury pool, members of the public were only able to view from the overall courtroom. Well, at least the defendants may be able to sit in the primary courtroom. Harry appendix 293. Um, all right. Well, I, you should have your own, you should have your record citation ready, but that's not an objection. This is, this is a statement from counsel. I mean, I'll read the whole paragraph. First of all, judge, my first inquiry is what accommodations have been made for the public to view this trial. And I would request that at least the defendant's family be able to sit in this courtroom, not only to comply with the constitution, but to give the defendant the moral support that he needs to withstand what is about to take place. The court responds, the public exit has access to these proceedings in another courtroom was being shown by video and audio. And then after the court's explanation, counsel says, I understand your honor. That's not an objection. That's the opposite of an objection. I would have to say this. That's in the context of this case, I'll put it this way. You know, you're a criminal defense lawyer. Yes. Can you tell this court how you make an objection in a criminal trial? I object. You've had many criminal trials. I have your option. You make an objection. I object your honor. Objection. Your honor objection. Your honor. Right. We don't have that here. Well, I would say I don't have those exact words. Do we have anything close to those words? Do we have, um, I resent that your honor, or I don't, I don't agree with your response, your honor, or I find your response unsatisfactory. Do we have anything like that? No, not like that. Judge Hardiman. I understand your honor. That, that we do, but, but I think taking the context holistically, what happened? So you have the trial and then you have the, the video feed to the other courtroom and the video quote, a full view of the quorum and all the parties in it. And that's in turn, citing to, uh, Harry's appendix at two 93. I think as a criminal defense attorney, if the trial court says there's going to be a full video to another, to the other courtroom, I think as trial, if I was trial attorney, I'd be entitled to rely upon what the trial court told me, because I can't be two places at once. I can't be in the trial representing my client. And then in the, in the, in the courtroom where the video feed is because that's physically impossible. And so I think at that point, when it came up later, and then it was in turn informed to the trial council that among other things, the, the video wasn't complete. The video turned off at time. The audio wasn't being able to heard the audio recordings, the tape recordings, the evidence wasn't being played in the second courtroom that the witnesses who are testifying, they couldn't be. And there were, there were certainly glitches. I think, uh, your friend on the other side would, would agree. There were some glitches here with the technology, but one of the things that I don't understand from this record is who actually was in the courtroom. Um, you know, this was a COVID trial, um, and the COVID protocols were changing in real time, right before the day before trial began. I think there was a, a declaration, um, defense council could have said, we object to the notion of video, right? It's possible that a full-blown video trial is not a public trial. Correct. That could have, that could have been, but it was not done. We're on plain objection to video. That is absolutely true. All right. And there were people in the courtroom, but to this day, I'm not sure who they were. I'm, I'm a little concerned about the absence of a record on this. Uh, we obviously know prosecutor defense council, the defendant and the jury and the judge and the courtroom staff, but were any members of the public in the courtroom at all on day one? I don't believe so, but there is, you have to read the, the, the, the record and make certain, I won't say leaps of logic, but you have to connect some dots. And here's what I would say the court to page 289 of my appendix, uh, the Gerard appendix 289, the, the CSO, Barbara Heilinger, if I'm pronouncing her name, she's talked about there being three people in the overflow room and that the, those few people were those three people to me, it was clear. It was my client's mother, my client's friend and Harry's mother. Those are the three people. Uh, what line on page 289? Okay. The courtroom and then over into the next, but we had the overflow room and like, it would be like three people in there. Yeah. Right. That tells me that there were this person testified that there were three people in the overflow room. That doesn't tell me who's in the courtroom. I'm interested in who was in the courtroom. Okay. Overflow then sort of by definition, there were others in the main courtroom because the overflow went to the other room. Yes. And then, so my understanding and I would have to, again, refer to the government's brief at page 45. So the court also noted that too many public spots were being taken up by staff of the U S attorney's office and directed the government to make those seats available to the public. That's citing Harry appendix at 1480 to 1481. I think when you take that concession by the government, along with the testimony from Barbara and the testimony from my client's mom, Harry's mom, and my client's friend, there were three people in the overflow room. Those three individuals, you had a government people in the courtroom. And then eventually the trial court is like, you've got too many government people here. Like, like let them go and let my clients and let the other people, you know, comment. I personally think that that is a more than reasonable view of the totality of the record of what happened. Well, too many government people implies that there were some non-government people in the courtroom and I don't know who they were. There's no record here. We don't, I mean, that I think is part of our challenge as a court of review, not a court of first view is that if we are going to say that someone was deprived of the very important constitutional right to a public trial, we need to know exactly how, when, and why the public was excluded from the trial. And what, what I'm reading here is an overflow room, COVID protocols, some people in the courtroom, but I don't know exactly who was there. Judge, I like, I understand where you're coming from. And if I were you, I'm sure I would have the same concerns, but I would say that understanding and reading the whole record, if the board has some doubts, I personally think it's more than reasonable for a record remand in order to clear this up. I think that it was, it was properly raised. Could the, the, the transcript and the, what happened then further detailed? Absolutely. I can't make representations because I wasn't trial counsel. Perhaps Ms. Walker can make better representations because she was, but that being said, I would also note though, that the unrefuted, there are some key points on the, what came out during the, the, the, the evidentiary hearing is that starting at two 67, you couldn't see all the defendants to 68. You couldn't see all the jurors that two, two 76, you couldn't see the witnesses, the witnesses again, two 76, you couldn't see the jurors. I understand that you have limitations on the technology. I understand it, but at some point, I don't know if you need to have multiple angles. You've, you've, we've all seen it. I'm NFL. We have the multiple angles, something along like that nature, but having perhaps like the, just the judge or just, just the, the trial attorney to exclusion of importantly, the jurors and the witness. I don't think that that is sufficient for the video feed for purposes of allowing that would be. So what you're describing sounds like a partial closure, right? Cause there's some video. It's not great. There's not enough angles, but it's not closed. It's partially closed. I mean, is that what a, is that what a partial closure looks like? So I would say that this judge Porter, I'm not entirely sure. I think I would. Typically when you think of partial closures, you talk about the variety was closed. Maybe a particular witness was closed, right? But like the public comes in and they get to see everything all at once. It's a very different, the partial closure in like that context and applying or grafting on to video. It's, it's, it's very, it's an inapt analogy. So I like, I understand that as a rubric that we have to go under, but it doesn't really fit because you can see the judge or maybe you see, see the defense counsel, the prosecutor, but you don't see the witness. Let me ask this. What if, so you bring this issue to the trial judge's opinion or attention and you say, is this, is this closed or open? He says, no, it's not closed. It's open. We're doing the best we can with the video under our constraints here with COVID and everything, but it's, it's open to the public. And then unbeknownst to him, a marshal or a CSO keeps mom out of the courtroom and says, you go over to the overflow. Unbeknownst to the judge, is that a sixth amendment violation? Yes. And I am not unsympathetic to the, to the work that trial judges have, and it's a difficult judge, but at the same time, it is, I can tell you who's not at fault for, for things not going according to Glenn. It's my client, right? There's only so much my client could do in trial counsel, since he wasn't in the overflow courtroom and he wasn't there and wasn't able to see what was or was not on, on, on the video. I would think that under those circumstances, bringing these issues to the trial court in a post-trial motion, that's in rule 52A contemplates, bring it at, I would say the first opportunity for the trial court to make, to correct it. It doesn't require a level of clairvoyance and trial counsel to know what's going on in a room where he's not there. Wasn't the, why wasn't the first opportunity in the moment? He's looking around, judge, my client's mom isn't in here. Why can't you know, this is not an open courtroom. Judge Porter, and that's fair, but I think if I'm trial counsel and I'm looking around and all the, all the seats were taken with perhaps members of the government at some point, like there's only so much you can do. But then that's not a closure of the courtroom. That's a discrimination issue or something else. Well, judge, because I would say this, I think the court could easily make the legal determination that members of the government, the prosecution team, other agents, other AUSAs do not qualify as the public for purposes of the public trial costs. I don't think that the court would be going that far of a limb to make that conclusion because I think the natural, if we had a record that showed that the whole room had been packed with government agents, you might have a textual point. The problem is we don't have a tells us that there were zero, close to zero members of the public in there. And that's your burden. I mean, we have to review only for plight error if we don't have an objection in a record, and we don't even have a proffer later on at post-trial about what each person remembers being in the courtroom. Judge, I understand, but I think, again, in the context of this case and the video and the video being outside of trial counsel and outside the defendant, I think those exogenous problems with the trial don't require a contemporaneous objection in the moment and that a rule, a motion for a new trial is an appropriate vehicle to bring to the trial court's attention. All right. Thank you, Mr. DeRuzzo. We'll hear you on rebuttal. Let's hear from Ms. Walker. Good morning, Your Honors. Keith Walker on behalf of Kareem. Harry, may it please the court. Now, I'm going to jump straight into some of the questions. And did you also reserve time for rebuttal? I did. I reserved three minutes. Thank you. Okay. Very good. So, with regards to the preservation of the Sixth Amendment issue, I'd like to first direct the attention to... Well, you've conceded plain error applies. I've conceded plain error applies, but just to make sure that the record is clear here, there were statements in the record that I believe should qualify as objections. So, I'm looking at appendix 80, page 80 of Harry's appendix. Objections, then plain error review doesn't apply. Well, in the event that my concession is improper, let me just make clear and point out in the record where there were statements on the record. So, you've got appendix... Well, I think we've covered it with respect. I think we've covered that ground. Mr. DeRuzzo didn't concede the point, and I feel like we covered that. I think you've got a lot of other issues here. It might be more fruitful to cover those, but go ahead. Thank you, Your Honor. So, appendix 80, that's the testimony of the CSO that in the overflow room were only the family and friends of the defendants. You've also got appendix 293 to 295, which... This is the Harry appendix? This would be the Harry appendix. Okay, 293. You've got 293, 295, courts indulgence, which should be where the issue was initially raised by Gerard's counsel, and I followed up on behalf of Kareem Harry as to the... What the really the crux of the Sixth Amendment is, and the Sixth Amendment issue is whether the jury can be keenly aware of its duty by viewing or seeing the public in the courtroom. In the context of this case, the primary issue was really the exclusion of the family members of the defendants, and the fact that that exclusion was intentional and was not similar to the very trivial inadvertent disclosure that happened in the Gallman case that was cited by the trial judge in his ruling on the post-trial motions. Does the jury know who's who when they're looking around and saying, that's a government agent, that's the family member, that's the... In this community, most certainly, Your Honor. We're talking about a community that has a population that's less than 100,000 people. On the island of St. Croix alone, the population is less than 50,000 people, and this is a community that's comprised of mainly people of color, Black people. If you're in a courtroom in St. Croix, in the Virgin Islands, and you look out to the very limited people that... And they were just spots of people in the courtroom. Who is actually in the courtroom? I still don't know that. Members of the US Attorney, and occasionally there was... Who? Who? How many people? What were their names? Who? Show me the record citation that tells me who was in the courtroom on day one, who was in the courtroom on day two. The record... There's not a record citation as to the names of the people who were in a courtroom. How about during... All right, no names. How about how many? There's not a record citation as to even the number on each day. What we do know is that during the jury selection, there were no members of the public. I'm looking at JA 293 to 295, and it's Judge Savage, I guess, saying... You're asking, hey, can we tell the jury that members of the family are here, aren't here because they can't be here? And his response is, there's a whole bunch of people out there, and they don't have nameplates. They don't know who's a member of the family and who's not. I can tell them there are other people in the overflow room. And the only response I see is, thank you, Your Honor. So we know there are people in the audience. We don't know which people. We certainly don't know what their races are to other people or what they would tell. And we certainly don't see anything like an objection. We see, thank you, Your Honor. Your Honor, if I may, on 294, beginning at line seven, and going over the course of the next few lines, I explained on behalf of Kareem Harry that over the course of six weeks, which was what the estimated length of the trial was originally, if you have someone who continues to come every day and sit together and sit behind a defendant— And the court is skeptical, says they could believe that anyone that's sitting there is supporting one or more of the defendants. They don't have nameplates on them or any other information on them. I'll tell them there's a room for all the public. I can do that. And your response is, thank you, Your Honor, including people associated with the government, people associated with the defendants. I see thank you. I don't see an objection. I understand, Your Honor. But with all due respect, with regards to the issue of the exclusion of the family, the family members of the defendant do not look like the members of the U.S. Attorney's Office. And when you go to Appendix 1480, there's where you have, again, bringing to the judge's attention the issue with the intentional exclusion of the defendant's family members. And at 1480, Judge Savage says himself, I'm kicking out the U.S. Attorney's Office. They're hogging up the seats. When it's brought to his attention that this is a problem, he does something about it. At that earlier stage, it's not brought to his attention that it's an issue. And when there's a complaint, Marshall saying family members aren't allowed, the court says, I'll deal with it. We don't have any record that this is being allowed to persist after being a contemporaneous objection. Well, Your Honor, the repeated times that it was brought to the court's attention, which I've cited throughout the statement of the case in my brief, I'm just highlighting certain sections of the record where there's a response from the judge. And of course, unfortunately, not everything was captured on a record. This was a daily issue with the trial. I understand. And look, I remember being a trial lawyer. I know it is not easy when you don't like how a judge is handling something, but there are ways to make a record, to proffer. I just want to state for the record that this or I'm noting that I'm looking out on the audience and it all appears to be white prosecutors and agents and no African-Americans of the same race as my client. I mean, there are ways to do that. And I don't see it here. And when it is brought to Judge Savage, he has some responses. And I see, thank you, Your Honor, in response. I don't see anything that says this still hasn't been dealt with. This is remaining a problem. Understood, Your Honor. And if I may proceed with the question that was posed earlier by Judge Babas as to whether this is a total closure or a partial closure, I would say that it was a partial closure. However, it was a partial closure that still violated the Sixth Amendment rights of Mr. Harry. And the reason I say that is because of the arguments regarding the exclusion, the intentional exclusion of his family members. Now, at the time of this trial, which was in March of 2022, the COVID-19 protocols had been greatly relaxed. At the time of the trial, there was only a 2% level of cases of COVID in the territory, such that a very strict closure of the courtroom, which occurred during the voir dire and jury selection, and the partial closure, which was still very limited and restrictive, was unwarranted by the COVID-19 protocols that had been initiated or enacted by the chief judge at the time of the trial. There was also no basis given by the trial judge as to why the COVID-19 protocols had to continue to be so strictly enforced. There was a standing order that greatly relaxed the prior restrictive COVID-19 protocols. And when you look at the record, the record does indicate that there was at least one day of a total closure, and that would be the first day of the government's case. So this is after the courtroom was completely closed for that day. So in light of the time of this trial, in light of the greatly reduced COVID-19 protocol restrictions, there was really not a basis to even allow for a partial closure of the courtroom. Now, before I move on to the next issue, Your Honor, as I outlined in my- Before you do that, I just want to make sure we're clear on the standard of review. Your brief on standard review says, whether the trial court violated Harry's right to a public review. Correct. But you stood up an argument and told us plain error doesn't apply. Your Honor, I will continue- I want to make sure I understand your argument today. I understood your argument when I read your brief to be a very straightforward, and I thought personally, a correct concession that plain error of you applies. But I heard you say something different from the podium. So where are you on that? I will continue to argue that plain error applies. But what I wanted to address, because Mr. Giroir's counsel didn't have the benefit of being present at that lengthy trial, I did want to point out the instances in the record where the concern regarding the exclusion of the family members were brought to the court's attention. Now, I- Let's give you a chance to address the compulsory process and due process issues. We haven't allowed you that. So go ahead and- Thank you. And then, Your Honor, my second argument would be the exclusion of Harry's witnesses. So during trial, there were co-defendants who had already pled guilty that started to try and contact Mr. Harry. A couple of them wrote letters. One in particular, Mr. Correa submitted a letter, handwritten letter, to Mr. Harry, which was then given to me and brought to the court's attention, indicating that Harry was not involved in the crimes for which Correa pled guilty to and which Mr. Harry was being charged with. The proffer of Correa's statements were made at Appendix 121 to 124 and provided to the court. There was also contact made by Mr. Cruz. Those are the two essential witnesses that I'm most concerned about with regards to Harry's defense because they were alleged co-conspirators of Mr. Harry. At the time they expressed the desire to testify on his behalf, they had already pled guilty. Right. And you're claiming the court had an ex parte meeting with those two, correct? Correct. What is the record support for that? The record support for that court's indulgence is found at Appendix 1653-9. I don't know whether that meeting or whatever it was was transcribed but at that page that should be where the trial judge came back and said your witnesses, those witnesses you want will not be testifying because they've invoked their Fifth Amendment privilege. And then the issue was then closed by the judge. Okay, so at Appendix 1653 lines 13 to 15 the judge says let me just update you on things with respect to Correa and Cruz. They will not be testifying. They're invoking their Fifth Amendment. And that was the first time. How do we know that was that knowledge, that update that was given by the district judge? How do we know that that was because of an ex parte meeting? Because, Your Honor, Correa and Cruz, I believe, had been brought from the facility in Puerto Rico over to St. Croix. And I would need to pull up the area of the appendix where the issue was left open after the in-chamber conference in which I proffered what their testimonies would be. And I can do that and pull it up during my rebuttal to bring it to your attention. I believe I may have run out of time, my initial 12 minutes, so I'll address that in my rebuttal. All right, very good. Thank you. Thank you, Ms. Walker. Ms. Roberts? May it please the Court, Tory Roberts, on behalf of the United States. I'd like to begin with a few factual corrections regarding the access that was provided via the live stream. Council on the other side made a few references to, for example, the live stream not showing the jurors and not showing the witnesses. But Gerard's mom, when she testified at the post-trial evidentiary hearing at pages 265 to 268 of Gerard's appendix, said that she was able to see the judge, she was able to see defense counsel when they were speaking, she was able to see the witnesses, and she was able to see some but not all of the jurors. I'd also point out that the district court made an adverse credibility finding regarding Harry's mother, and that's at page 301 of Gerard's appendix. So to the extent there are questions regarding the access that was provided via the live stream, that the only source is the testimony of Harry's mother, that should be viewed in the context of that adverse credibility finding that the district court judge made. He said he didn't believe her testimony, is that correct? Correct. He said he found Gerard's mother to be very credible, but he did not find Harry's mother to be credible. The court also made a factual finding that the family and friends were not barred from first come seating. Made that factual finding in the moment, and again, I think on the post-trial motions. What's the support for that finding? It sounds like this is disputed, whether they were barred, at least on some days, from the first come seating. It was disputed below, but I would say the district court was the one who was in the position of making that factual finding, and here it would be reviewed for clear error, and I don't think the defendants have demonstrated that that was a clearly erroneous finding. The district court judge was present for every day of trial and was able to see who was coming in and out of the courtroom. I believe the reference in the moment that you're discussing is at 299 of Gerard's appendix, and I believe right around there at 299 to 300. The judge also says, I was able to see people coming in and out of the courtroom. When someone got up and left, someone else would come in, and the judge said that he was keeping tabs on that as the trial was proceeding. Certainly, the judge wouldn't be able to keep track of everyone coming in and out, but at least that's what we have in the record, that there were people coming in and out of the courtroom, and that access was provided on a first come first serve basis, and I just don't think there's anything in the record to show that that was of the public, aside from government employees, were in the courtroom. We don't have a clear statement in the record, but I think going back to Judge Hardiman's point, that would be the defendant's burden to show that, and here, as requested by the defendants, the judge held a post-trial evidentiary hearing where the defendants would have had the ability to put in evidence on that question, and they did not do so, but what we do have is the factual finding that you were referencing, that access was provided on a first come first serve basis. The other point that I would like to- At some point later in the trial, the judge adverted to the notion that the government was fogging the seats in the courtroom, correct? Yes, but I don't think that that statement shows that they were provided any sort of preferential treatment. You're right that the judge acknowledged that there seems to be too many seats being taken up, and he said he would take care of it, and then after that is when Gerard's mother and Harry's mother were able to access the courtroom, but in the judge's decision on the post-trial motions, he said that access was provided on a first come first serve basis, which would rebut any suggestion that the members of the U.S. Attorney's Office were somehow provided preferential treatment that allowed them to get in first. They just happened to arrive at the courthouse earlier, at least that's what we have in the record, is that they had the same opportunity to attend the trial as the members of the defendant's family. Wouldn't you agree, though, it would be sort of best practices for the court, if the court were made aware, to give priority to members of the defendant's families and perhaps also members of the victim's families? I think the government agrees that that would be best practice, but I think the important point here is that the defendants did not request that, and so, you know, they did mention at the very beginning, at the time when the process evolved throughout the trial, at the very beginning, the court said, looking at the courtroom and the need for social distancing, I'm not sure if we're going to have people in, and then when a few people were allowed in, there was no specific request made that seats could be reserved for family and friends, and the judge would need someone to put that to their attention, to say, I have this person who would prefer to be in the primary courtroom, and currently they're not allowed in, and so here, every time one of those types of issues was raised to the judge, it was addressed, so I think certainly it would be best. Is there a Sixth Amendment requirement that particular people be allowed in to satisfy the public trial, right? I think over the objection of the accused, I think it would not automatically be a Sixth Amendment violation. You need to go through the Waller factors, and there could be a case, and some of the other circuit courts who have addressed COVID closures have still upheld closures that were partial closures, where the only access was provided via live stream, but it needs to be a fact-specific inquiry for the reason, what reason is supporting the... Waller requires a balancing of factors, correct? Correct. Why would we call it a partial closure if the only access is on video? Shouldn't we be concerned about the notion that a trial could be conducted, and somebody could lose their liberty or their life, and the public would only have access through a video feed? Wouldn't that concern you? I think the way that that needs to be evaluated is in the context of the values that the Sixth Amendment provides, so the values of encouraging witnesses to come forward, ensuring that the judge and the attorneys are carrying out their duties appropriately, and so when you have a contemporaneous video feed... There's one more, I think. Public confidence in the trial, isn't that important too? Yes, but I think... And how can the public have confidence in a trial in an age of technological advancements that allow for all kinds of deepfakes and other mischief, yeah, to video? I think it's a fair question, but you would need to... I obviously have a grave concern about that. I'm asking whether the government shares that concern. No, in the sense that I think, as I was mentioning, it needs to be a fact-specific inquiry, so certainly if the judge just decided, I'm not allowing anyone in the courtroom, you have to watch via video, and there was no reason for it, I think that would certainly... The reason is a pandemic. Yes, and I think... And recall this... Why isn't the choice... The judge has to either postpone the trial until human beings from the public can be invited in, or postpone the trial? Well, you also have to balance the defendant's speedy trial rights, and here I would... The judge says, I can't put people in the courtroom because they might die, and the defendant insists, then the judge says, well, if you insist that I'm gonna have an overflow room so that people aren't killing each other, then the defendant's gonna have a tough time bringing a constitutional claim on those facts. But I think here that emphasizes the importance of the defendant raising an objection if they are not happy with the way that their is being structured. So the district court here was trying to balance those two interests. That's where a plain error review does a lot of work, but was there error at all here? No... And through the plain error steps, was there error? There was not error, I think... Why? So the district court appropriately balanced the need for public access to the proceedings via the video live stream, and then the judge, throughout the proceedings, adopted the procedures that were used once he was able to view the courtroom. And after that first day, see, I think I can allow a few members of the public into the courtroom. So that shows that the judge was attempting to balance the interests of the COVID pandemic and needing to protect the public with making sure that the trial was public. I think moving on to even the second factor, certainly if there was error, it was not plain. We have here an unprecedented occurrence of trying to conduct trials during a global pandemic. And as we note in our brief, throughout the country, district courts were using similar procedures where trials were being conducted using a contemporaneous video live stream. So even if there was an error, it was not plain at the time that the trial was conducted or even now at the time of appellate review, given that several circuit courts have validated this procedure as long as there is video that is being provided. And then moving on, even the fourth factor, even if there was an error here, I don't think it would be appropriate for the court to exercise its discretion to correct the error, given that you had a sprawling trial, multiple defendants, 46 counts. It would be a significant burden to retry this case. And also the trial had, one of the considerations is that the trial had the hallmarks of a fair and impartial trial. There's no sign of misconduct or anything like that that would suggest that there was any impropriety or reason for a retrial here. Do you know if any of the media were in the trial? Were there reporters there? I do not know. The one thing I will point you to is on page 1480 of Harry's appendix, when the issue was raised about the inadvertent closure of the overflow courtroom, there was a reference to the fact that in public reporting, it was noted that the overflow courtroom was inadvertently closed for about an hour one morning. So certainly there was at least some media interest in the... That could have been self-reported by one of the spectators. Yes, correct. So that's the only thing that I have in the record to show that was some media interest, but I'm not... There's nothing in the record to show that there was media at the trial. Unless the court has any further questions on the public trial issue, I'd like to just turn briefly to the witness issue that Harry has raised regarding Correa and Cruz. So the point that I would like to begin with is the chronology of when Cruz and Correa indicated that they intended to invoke their Fifth Amendment rights. So Harry's counsel filed a request for writs for both of those witnesses during the trial. And immediately after, the following day, counsel for both Cruz and Correa opposed those writs and indicated that both witnesses would be invoking their Fifth Amendment rights. And Cruz also provided an affidavit that was attached to his attorney's filing, indicating as well that he intended to invoke his Fifth Amendment rights. So it's simply incorrect to suggest that the first time that the defendants invoked the Fifth Amendment was after some supposed ex parte meeting with the court. And as I think Judge Hardiman's questions indicated, there really isn't anything in the record to support the assertion that there were these ex parte meetings. So ordinarily, privileges invoked in response to specific questions, what was the basis for the district courts deviating from that ordinary practice and allowing them to do it in a blanket manner? Sure. So I think here you have two defendants who were co-defendants in this very case who were charged with some of the same offenses. Their charges arose out of their involvement and activities with the enterprise. And so I think here it was clear from the judge's knowledge of the case that they could legitimately refuse to answer essentially all relevant questions. This was the same judge that took their guilty place? I believe so. I am not positive on that, but I believe so. Well, actually, for Correa, yes, because Correa pled shortly before the trial. Cruz, I believe, pled several months before, so I'm just not certain. He was also their sentencing judge? Yes. And they were both sentenced in December of 2022, so several months after the trial. And then the other point I would like to make in terms of the timeliness of the proffers that were made, the proffer that was made regarding Correa, the letter that was provided, that was not provided to the court until two months after trial. And then for Cruz, there are references in Harry's brief to supposed letters or statements that were provided, but that's nowhere to be found in the record. So we do not have anything in the record providing a proffer for what Cruz's testimony would have shown even if he had testified. If there are no further questions, the government would ask the court to affirm the defendant's convictions. All right. Thank you, Ms. Roberts. Let's hear rebuttal from Mr. D'Aruzzo. May I ask you to begin, Mr. D'Aruzzo, with your history-based argument? I was quite interested in that. We're not really sure where this public trial right comes from. At least I'm not. As far as we can tell, it goes back to the 11th century. To Norman England. Right. And obviously, avoiding the—I don't speak French at all, so I don't—Charles de Letray, maybe you're a Francophile. No, unfortunately not. Though I believe in some of the cases I read, there was some discussion of the term moot, not in the context of a moot court, but a very large gathering of the community, of the village, of the public. But before I jump into that, I do want to do something for Ms. Walker. Judge Beavis and Judge Porter, just so you know, your placards are switched. So when Attorney Walker looked at you, Judge Beavis, and referred to you as Judge Porter, I saw some confusion on behalf of your face. And I think that now— We appreciate that, Mr. D'Aruzzo. And I can report that's not the first time this has happened, because back in the day, our departed colleague, Judge Slover, and I were sitting and we had to do the same thing. It happens. So thank you for that. So anyway, getting back to your history, I was very interested in it. I think it's a very credible argument, but here's my challenge to you on it. Waller strikes me as a consummate balancing case. And I understand that the Supreme Court in certain areas has pretty strongly moved away from balancing tests, multi-factor tests, the Levin test, etc. But what are we supposed to do with that? As an inferior federal court, does Waller not require us to balance? And does that not make your history-based argument relegated to a higher court if they so chose to take the case? I admit, at some level, it's problematic for me, but like most problems in life, I don't believe it's insurmountable. I would say this. I think the broad picture from once you graduate law school, like starting with Crawford v. Washington, Apprendi, Bruin, Jarchese, you have what I see as a shift in thought from the Supreme Court back to text, history, and tradition. And so yes, I understand that we have Waller, we have Gannett Press, we have the cases that are on the books that as an inferior court, I think it's Agnosti or some Supreme Court case basically said something to the effect of, let the Supreme Court change its case law and the lower courts are to apply it, lest there be chaos below. I get it. However, I think the pinhole that I'm trying to thread here, and admittedly, it is a bit of a pinhole, is that when you have cases that are on all fours, then yes, you would apply Gannett and you would have to apply Waller. Yes, those are balancing. However, the arguments that I'm making here, they're a little different. They're not contemplated. I'm not asking for the trial court to do a balancing of total closure. How many people need to be in the courtroom? Is it five? Is it 10? Is it 20? That kind of balancing. I'm doing something a little different, a higher level of abstraction. And that is, do we even in contexts like this, and I would dispute what my brother on the other side, pandemics are not unprecedented. The Spanish flu early in our country. Do we have any cases? I did a search and perhaps didn't search hard enough, but I was curious as to how the American courts continued dispensing justice during the Spanish flu. And I couldn't find anything. Did you look into that? I couldn't find anything either. I actually thought that that was interesting. But what I do know is through the course of American history, smallpox, cholera, typhoid, Mary. So you have outbreaks, whether localized or nationwide. And so the fact that we had an unprecedented in recent times, sure, like it may be unprecedented since the Spanish flu, but that was not unprecedented, circa 1787 at the founding. That's for sure. But also to go to your point, Judge Hardiman, standing here in 2025, I don't think anyone would disagree that, don't believe everything that you read. Well, now it's don't believe everything that you see. And I don't think it's going out much of a limb saying that the American public, myself included, are much more jaded as to what you see in the last couple of years. And I think you're right. I think having something purely on television, that may have been good enough in the 80s and the 90s. I don't think it's good enough now. And I especially note that at a certain level, if you have one camera or two, limited number of cameras focused on certain actors in the courtroom, at some level, there is a value judgment made as to who's being shown at what time and when, which is, it takes away from the public, the individual public members ability to look at whomever they want to, the members of the cast in the play at the time to submit that that is not a call for whomever to make that calls to whom the public gets to look at when and for how long that's something that has to be made on the individual public members. And that ability, that choice, that agency is taken away when you have a video of not the entire courtroom. So that being said, I asked, I see my time is up or just about up. I would ask the court to vacate my client's conviction. However, this court does have concerns about the record before it. I think the court be well, it's indiscretion to remand for a record remand hearing to flesh out those concerns that you've, you've stated in particular who the individuals were in the court, in the courtroom. Was it only members of the government, the prosecution team? Was it only the U S attorney's office? Was there anyone in the courtroom other than members of, of, of the government for the, the, the everything, but the last three days of trial, when my client's mom, Harry's mom and my client's friend were there. And so I think the court would be well, it's indiscretion for a limited record remand to flesh out those facts. Thank you, your honor. I took the opportunity to seek to identify in the record the, any additional information regarding an ex parte hearing. I could not find any, but I will take additional time to do so after oral argument. And should I find any, I will file the appropriate motion with the court now with regard to rebuttal, just a couple of statements with regard to. The question about the law and whether there should have been some sort of provision made for friends and family first one to direct the court's attention to two 93 of the Harry appendix lines three through five, there was a specific request from counsel for Paul Girard to make accommodations for the friends and family to be seated in the main courtroom. So that was, there was a specific request made for that. And with regards to the law supporting that, I believe that the Oliver opinion coming out of the United States Supreme court would also indicate that the sixth amendment, right? Yes, it applies to the public, but there should be some special treatment afforded to the friends and families, family members of the defendants who also seek to view the trial. Now there's also testimony in the post trial motion hearing some from the mother of Mr. Harry, and there was no specific finding as to why she would not be considered credible. What's interesting. And what happened during this trial was that it was the defendants, family members who had to bring their clothing every day and they had to be here by a certain time. And that was part of the record that was made. There were, there was a specific reason why they would be coming so early. So what you have here, and particularly if you look at appendix, I believe it's 1480 lines 19 through 22, where I specifically identified the Marshall who had informed the family members that they could not enter, enter the courtroom that was Marshall cook. And that is what led to the trial judges comment that the U S attorneys are hogging up the courtroom, but they were able to hog up the courtroom because the marshals were excluding the family members. So your honor, I, in this instance, you have a lengthy trial in a small community. And you have members of the jury who recognize people in the community and you have a courtroom that was filled with, well, not filled, but the very few people who were permitted in the main courtroom were actually not members of the community. When you look at the transcript for the post trial motion hearing. And I think it's also in the order that was issued by the judge denying the post trial motions. There was even a comment that the marshals were dressed in plain clothing, plain clothing in the form of suits. And that they're clearly, we're not members of this community that the jury would recognize as being family members of the defendants. I think I've close to exhausting my time. Thank you, Ms. Walker. Thank you, Mr. Jerusalem. Thank you, Ms. Roberts. The court will take the under advisement and we will take a brief recess before the final case.